IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SEAN D. CONROY,                        )        CASE NO. 5:15CV1789
                                       )
                    Plaintiff,         )
                                       )
             v.                        )
                                       )        MAGISTRATE JUDGE
                                       )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                 )
SECURITY ADMINISTRATION,               )
                                       )        **MEMORANDUM OPINION & ORDER**
                    Defendant.         )


Plaintiff Sean Conroy ("Conroy") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc.

12.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Conroy protectively filed an application for DIB on March 10, 2014, alleging a disability

onset date of May 15, 2011.[1]  Tr. 18, 157.  He alleged disability based on the following:

fibromyalgia, sleep apnea, back injury, and patellofemoral pain syndrome.  Tr. 161.  After

denials by the state agency initially (Tr. 68), and on reconsideration (Tr. 77), Conroy requested

an administrative hearing (Tr. 96-97).  A hearing was held before Administrative Law Judge

---

[1]  The record contains two alleged onset dates: May 15, 2011 (Tr. 157), and January 1, 2012 (Tr. 134).  The ALJ and
Conroy use May 15, 2011, as the onset date (Tr. 18, Doc. 14, p. 1) and the Court uses that date as well.

("ALJ") Charles Shinn on February 3, 2015.  Tr. 32-61.  In his March 18, 2015, decision, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Conroy could perform, i.e., he was not disabled.  Tr. 26.  Conroy requested review of the ALJ's decision by the Appeals Council (Tr. 13) and, on July 6, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Conroy was born in 1973 and was 41 years old when he filed his application.  Tr. 134. He completed high school and has an associate's degree.  Tr. 46.  He was medically discharged from the army in 2002.  Tr. 53.  He previously worked as a machinist, warehouse worker, logistics clerk, and in shipping and receiving.  Tr. 85-86.  He last worked in 2011.  Tr. 86.

### B.  Relevant Medical Evidence

Conroy primarily received treatment from the Veterans' Affairs Administration ("VA"). Tr. 236.  On January 23, 2013, he saw Certified Nurse Practitioner Rosemary Fanous complaining of "elbow pain with weak hand grips" that had begun six months prior.  Tr. 397. He also reported having chronic knee pain and sleep apnea.  Tr. 397.  Fanous diagnosed him with tennis elbow and bilateral arm radiculopathy.  Tr. 397.

The same day, Conroy had an x-ray taken of his cervical spine, which showed severe narrowing of the C4-C5 and C5-C6 disc spaces with mild to moderate degenerative changes and spurring.  Tr. 292.  The impression was degenerative disc disease with moderate degenerative cervical spondylotic changes in his mid-cervical spine.  Tr. 292.

On February 20, 2013, Conroy attended a Physical Medicine and Rehabilitation appointment with Daniel Tran, MD, for elbow and knee pain.  Tr. 388-390.  He complained of

pain in his right arm that had moved to his left arm and left-knee pain that increased after activity.  Tr. 388.  The knee occasionally gave out on him.  Tr. 388.  Upon examination, Dr. Tran found tenderness over Conroy's lateral epicondyle bilaterally in his elbows, tenderness over his lateral and medial joint lines in his knees, and tenderness over his bilateral lumbar paraspinals. Tr. 389.  Dr. Tran assessed him with bilateral epicondylitis, bilateral osteoarthritis in his knees, lumbar spondylosis, and myofascial pain.  Tr. 389.  He recommended physical therapy and a TENS unit trial.  Tr. 389.

On March 12, 2013, Conroy attended a physical therapy consultation with Nurse Fanous and Joan Hollis, PT.  Tr. 381-385.  Conroy reported constant, moderate to severe pain in his back and neck.  Tr. 382.  He explained that his lower back pain manifested in the 1990s when he was in the military and his knees gave out and he fell.  Tr. 382.  He stated that his military doctor diagnosed him with patella pain syndrome and "something torn" at C2-3.  Tr. 382.  He had physical therapy comprised of a "variety of stretching ex[ercise]s" thereafter for six months and again in 2002, but it did not help and it made his pain worse.  Tr. 382.  Hollis rated Conroy's rehabilitation potential as "Poor w[ith] multiple co-morbidities, constancy, intensity, and lack of improvement w[ith] previous conservative t[reatment]."  Tr. 385.  Hollis also observed that Conroy showed some improvement after his treatment session, with his pain decreasing to a 5/10 from a 7/10 after using a TENS unit.  Tr. 384.  She recommended he attend the physical therapy clinic every week for six to eight weeks.  Tr. 385.

In May 2013, Conroy moved to Washington and, on November 7, 2013, he visited the VA and saw Nurse Practitioner Alahna Gross, complaining of pain from his neck to his tailbone. Tr. 251.  His hands, joints, elbows, neck, knees and hips had been getting worse over the last year and a half.  Tr. 251.  He had become irritable because of his pain and he did not like taking

medications.  Tr. 251.  He also stated that Ultram helped with his pain in the past "but he was very quick tempered."  Tr. 251.  He was using his TENS unit frequently and stated that his knees would give out on him, although he could not remember which one.  Tr. 251.  Upon exam, he appeared to be in no distress.  Tr. 252.  He would occasionally grunt or move slowly and at other times "does ok."  Tr. 252.  He was tender to palpation all the way down his spine and he could not keep his toes pointed towards the ceiling under pressure.  Tr. 252.  Gross diagnosed him with chronic pain disorder, ordered spine x-rays, and prescribed tramadol for his pain and sertraline to control his mood while on the tramadol.  Tr. 253.

On February 7, 2014, Conroy saw Gross again, complaining of continued chronic pain in his lower back, upper back, neck, muscles, hands, and knees.  Tr. 246.  He had not been taking his sertraline and had half his bottle of tramadol; he reiterated that he did not like taking medication.  Tr. 246.  He had not had his x-rays taken.  Tr. 246.  Upon exam, Conroy had mild laxicity in his ACL and he could not keep his left toe pointed toward the ceiling against pressure.  Tr. 247.  His left SI joint was tender to palpation and there were large muscle groups on the left and right side of his back that appeared to be hypertrophied.  Tr. 247.  Gross diagnosed him with chronic pain and discussed the option of physical therapy with him.  Tr. 247.

On February 26, 2014, Conroy saw rheumatologist Wendy Eider, MD, for his joint pain.  Tr. 241-245.  He reported widespread pain in his joints that worsened with changes in weather.  Tr. 241.  He could not sit or stand for too long and did not sleep well: "feels like his legs are in a vice when he is in bed and after a couple of hours he has to get up and move around."  Tr. 241.  He reported some difficulties in activities of daily living such as walking, bending down to pick things up off the floor, and getting in and out of a car.  Tr. 241.  Upon exam, Conroy's gait was normal and he was able to walk on his heels and toes and perform a tandem walk.  Tr. 242.  His

range of motion in his neck was mildly decreased, he had mild crepitus in his knees, and multiple tender points in his upper and lower extremities.  Tr. 242.  His rheumatoid factor was negative. Tr. 242.  Dr. Eider diagnosed Conroy with a "classic case" of fibromyalgia and advanced osteoarthritis in his cervical spine without radiculopathy.  Tr. 243.  She started him on gabapentin with slow escalation.  Tr. 243.

On May 15, 2014, Conroy saw Nurse Gross complaining that his tramadol and muscle relaxers made him feel "really sleepy" although his muscle relaxers were "helpful."  Tr. 239.  He still had his tramadol and muscle relaxers from the previous November and he stated that he does not like to abuse medication.  Tr. 239.  Upon exam, he ambulated easily and was in no acute distress.  Tr. 240.  Gross asked him why he would not take his medications when he is hurting so badly and Conroy, after some hedging, replied that when he was young his grandfather died of liver failure and he recalls seeing him lying on the couch slowly turning yellow, which Conroy attributed to him taking too many pills.  Tr. 240.  Gross wrote, "Once I was aware of this, we decided to try some non-systemic topical medications."  Tr. 240.

Conroy moved back to Ohio in September 2014.  Tr. 54.  On November 24, 2014, he saw rheumatologist Elaine Greifenstein, MD, at the VA.  Tr. 431-439.  He stated that he "hurt all over, stabs everywhere."  Tr. 432.  Tramadol helped bring his pain down from an 8 to a 5 but he did not take it all the time.  Tr. 432.  Upon examination, Conroy was in no acute distress sitting at rest but had to stand and stretch his knees, back and legs several times throughout the visit. Tr. 435.  He had isolated strength of 5/5 for all groups of upper and lower extremities and diffuse muscular tenderness anywhere that he was touched, particularly on his thoracic and lumbar paraspinal muscles.  Tr. 435.  He had no tenderness in his midline spine or SI joints.  Tr. 435. He had decreased cervical flexion due to "muscle pain" but had well-preserved cervical

extension and lateral rotation.  Tr. 435.  His right knee had a range of motion of 0 to 130 with anterior discomfort and his left knee had a range of motion of 0 to 125 with moderate medial discomfort.  Tr. 436.  Dr. Greifenstein diagnosed him with chronic pain syndrome/widespread myofascial pain syndrome, chronic low back and neck pain, sleep apnea and disordered sleep, depression, and left knee pain.  Tr. 438.  She indicated that it was "imperative that he keep the WP Sleep Medicine consult appointment" because normalizing his sleep pattern would be necessary to improve his overall pain.  Tr. 438.

On November 26, 2014, Conroy attended a sleep medicine consultation with Nurse Dennis Kelley.  Tr. 297-298.  Conroy complained that he experienced sleepiness and fatigue or decreased energy.  Tr. 297.  He complained that his BIPAP pressure was too high and admitted that he had stopped using his BIPAP "a while ago."  Tr. 297.  Kelley planned to lower the BIPAP's pressure so it would be more comfortable.  Tr. 298.

On December 9, 2014, Conroy saw Farhana R. Moyen, M.D., for a physical therapy consultation to have a functional assessment completed.  Tr. 271-274.  Conroy complained of constant pain of his cervical, thoracic and lumbar spine as well as pain in his upper and lower extremities.  Tr. 271.  His low back pain occasionally radiated to his hips.  Tr. 271.  His pain worsened with activity and changes in the weather and was 6/10 on the day of the exam.  Tr. 271.  Upon exam, he demonstrated full range of motion in his lower and upper extremities but a 50% reduction of range of motion in his cervical spine and a 50% limitation of all range of motion in his lumbar spine as a result of pain.  Tr. 273.  He had 4+/5 muscle strength in his lower and upper extremities and demonstrated proper gait sequence with a good plus balance grade on even surfaces, although his gait speed was reduced and he reported an increase in lower back pain.  Tr. 273.  He demonstrated slight mechanical failure in his upper back when tested with a

20-pound object.  Tr. 274.  He was able to remain seated for 20 minutes with moderate corrective positioning and stood for 10 minutes with mild corrective positioning.  Tr. 274.  On stairs, he demonstrated a loss of balance and an increase in left knee pain and required the use of a handrail.  Tr. 274.  He was unable to safely perform the crawling and kneeling exercises.  Tr. 274.  Overall, Dr. Moyen observed that Conroy "demonstrated guarded movement patterns as a result of generalized pain patterns" and reported an increase in his pain to 8-9/10 at the end of the evaluation.  Tr. 274.

On December 24, 2014, Conroy had an MRI of his left knee, which revealed a meniscal tear.  Tr. 309.

On January 27, 2015, Conroy saw Dr. Greifenstein.  Tr. 405-409.  He complained of pain all over that comes and goes and feels different every day.  Tr. 405.  He reported intermittent catching and locking of his left knee that resulted in a fall down a flight of stairs.  Tr. 405.  He tried to exercise but it was hard when the weather "is this cold"; when he lived in a warmer climate he could go hiking regularly and was considering moving again to a warmer climate.  Tr. 405.  Upon examination, Conroy had no acute distress while sitting at rest, was able to stand up without difficulty, and had a non-antalgic gait.  Tr. 407.  He was alert and appeared to be in a brighter mood.  Tr. 407.  He had isolated strength of 5/5 for all groups of upper and lower extremities with diffuse muscular tenderness in his paraspinal muscles.  Tr. 407.  He did not have tenderness in the middle of his spine, or in his shoulders, elbows, wrists, or hands.  Tr. 407.  His left knee had a range of motion of 0 to 125 with mild medial discomfort.  Tr. 407.  He acknowledged that he slept soundly the night before despite not using the BIPAP and that some nights he would not use it.  Tr. 407, 405.  Dr. Greifenstein diagnosed him with chronic pain syndrome/widespread myofascial pain syndrome, chronic low back and neck pain, sleep apnea,

disordered sleep, depression, left knee pain, and a tear of the posterior horn of the medial meniscus in his left knee.  Tr. 408-409.  Dr. Greifenstein again stressed that it was very important for Conroy to use his BIPAP because the failure to treat his sleep disorder could increase his pain levels.  Tr. 409.  She also advised he treat his depression; pursue regular daily activities, particularly aerobic exercise; schedule and keep an appointment to discuss whether surgery would be appropriate for the meniscus tear in his knee; and stated that he may benefit in the future with a referral to the Intensive Chronic Pain Management Program.  Tr. 409.

### C.  Medical Opinion Evidence

#### 1.  Consultative Examiner

On June 5, 2014, Conroy saw Derek J. Leinenbach, M.D., for a consultative examination. Tr. 260-263.  Conroy reported chronic pain and obstructive sleep apnea.  Tr. 260.  He had vague pain in his middle and lower spine that did not radiate and knee pain that worsened with walking, getting up and down, and climbing.  Tr. 260.  He stated that he performed his activities of daily living independently, could perform light household chores, and enjoyed fishing.  Tr. 261.  Upon examination, Dr. Leinenbach observed that Conroy walked into the examination room alert, oriented, and without acute distress.  Tr. 261.  He could get on and off the examination table without assistance and take both shoes off and put them on without assistance.  Tr. 261.  His gait was within normal limits, his tandem gait was unremarkable, and he could walk on heels and toes normally.  Tr. 262.  He could hop and squat without assistance and he had full range of motion in all areas.  Tr. 262.  He had 5/5 muscle strength bilaterally in his upper and lower extremities, normal muscle tone and normal reflexes.  Tr. 263.  He tested positive at 14/18 tender points.  Tr. 262.  Dr. Leinenbach diagnosed Conroy with lumbago, chronic knee pain, generalized body pain favoring fibromyalgia and/or functional overlay, and obstructive sleep

apnea.  Tr. 263.  He opined that Conroy could walk, stand, and sit without limitations, could

lift/carry 50 pounds occasionally and 25 pounds frequently, could reach, handle, finger and feel

frequently, and had no postural or environmental limitations.  Tr. 263.

### 2.  State Agency Reviewers

On June 19, 2014, Howard Platter, M.D., a state agency physician, reviewed Conroy's

file.  Tr. 69-74.  Regarding Conroy's residual functional capacity ("RFC"), Dr. Platter opined

that Conroy could stand, walk and sit for about six hours in an eight-hour work day and had no

postural limitations.  Tr. 73-74.

On July 29, 2014, Robert Hander, M.D., a state agency physician, reviewed Conroy's

file.  Tr. 78-87.  Dr. Hander adopted Dr. Platter's findings but further opined that Conroy could

lift/carry 50 pounds occasionally and 25 pounds frequently; frequently climb ramps, stairs,

ladders, ropes, and scaffolds; frequently kneel and crawl; and should avoid concentrated

exposure to vibrations and hazards.  Tr. 84-85.

## D.  Testimonial Evidence

### 1.  Conroy's Testimony

Conroy was represented by counsel and testified at the administrative hearing.  Tr. 33-55.

He testified that for the past five months he has lived in a house with his 17-year-old son after

they returned from Washington, where they lived for a year and a half.  Tr. 39.  He drove back to

Ohio from Washington and it took him "almost a week and a half."  Tr. 39.  The drive took

longer than it should have because he had to make frequent stops due to back pain and his son

could not help drive because he did not have a license.  Tr. 41, 50.

Conroy stated that he was taking tramadol, Flexeril and an antidepressant and reported

side effects of fatigue, nausea and dizziness.  Tr. 40.  The VA had given him a 60% disability

rating: 30% for his sleep apnea, 10% for his knee, and 10% for his back.  Tr. 40.  He stated that he has spasms in his lower back that render him unable to sit or stand for prolonged periods.  Tr. 40.  He could sit for roughly 20 minutes and stand for between 10 and 15 minutes.  Tr. 40.  His medication helped his back sometimes, depending upon the day, but the pain was constant and some days it was worse than others.  Tr. 41.  Sitting too long, walking and stretching all made his lower back pain worse.  Tr. 41.  He has tried applying a combination of heat and ice but "other times it makes it worse." T r. 41.  He has patellofemoral pain syndrome in his knees and his left knee, his worse one, gives out on him periodically.  Tr. 41.  There has been recent talk of surgery for his left knee to address that problem but he also has a meniscal tear in his left knee that needs to be repaired.  Tr. 42.  He had an appointment scheduled for a month after the hearing to discuss the meniscal tear surgery.  Tr. 42.  To manage his knee pain, Conroy will sit and relax, sometimes apply heat or ice, and, if those do not work, "then I have to just basically rely on medication which doesn't fully rid it."  Tr. 42.

Conroy described his fibromyalgia as a "constant flu-like syndrome" which felt like a constant soreness throughout his body, "like I ran a marathon every day."  Tr. 43.  He has to take naps and relax and lay down throughout the day; it interrupts his sleep and his daily activities.  Tr. 43.  He normally sleeps around four hours per night but could get as much as six or as little as two hours sleep and is awakened frequently by pain.  Tr. 43, 47.  Throughout the day he normally naps once or twice for three to five hours.  Tr. 44.  He also stated, "even though I actually could lay down for eight hours and sleep for eight hours, I'm—well, I was told by medical that I'm actually only getting three to four hours of actual sleep.  My REM stages are interrupted."  Tr. 47.

Conroy stated that during the day he tries to stay active as much as possible.  Tr. 44.  He does basic chores around the house and his son helps with the cooking and cleaning, although Conroy can clean the house himself if he needs to at his own pace.  Tr. 44, 49-50.  He also does laundry and drives himself to the grocery store and doctors' appointments.  Tr. 45.  He goes fishing and had gone three or four times with his son in the past summer and fall.  Tr. 45.  Fishing was not a problem for him because he could "sit and stand and do what you want."  Tr. 53.  He used to play ten softball games every week and bowl in two bowling leagues but he could no longer do either activity.  Tr. 52.  He still took his son bowling every few weeks but "most of the time, I can't even bowl."  Tr. 52-53.

Conroy stated that his knee pain felt acute, "like screwdrivers or something being stabbed in my joints."  Tr. 48.  This pain impacts his ability to sit in a chair, so at home he lays back in a recliner.  Tr. 49.  His knees swell when he has to go up and down stairs frequently or when he walks for long periods.  Tr. 49.  When asked about his neck pain, Conroy explained that it was all tied to his spine and that turning his head hurt his entire back from top to bottom.  Tr. 49.  He uses his TENS unit a couple times a week on his back and sometimes throughout the day.  Tr. 50.  It makes his lower back numb but "it doesn't help with the overall whole body pain."  Tr. 50.

Conroy testified that he has an associate's degree from Cuyahoga Community College.  Tr. 46.  He stopped going to campus two years ago because he could not handle the walking and the sitting in the classrooms, so he switched to online classes.  Tr. 51.  He also took online classes when he was living in Washington but it was hard to "concentrate and maintain" because of pain and his sleeping problems and he had to drop out.  Tr. 46, 51.

## 2. Vocational Expert's Testimony

Vocational Expert Roxanne Benois ("VE") testified at the hearing.  Tr. 55-61.  The ALJ asked the VE to determine whether a hypothetical individual of Conroy's age and education could perform any work if that person had the following characteristics: can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; can sit, stand, and walk within the customary tolerances for light level work; can occasionally reach overhead bilaterally; can occasionally kneel and crawl; cannot operate vibrating hand tools; and must avoid workplace hazards such as unprotected heights and exposure to dangerous moving machinery.  Tr. 56.  The VE answered that such an individual could perform jobs as a laundry folder (100,000 national jobs, 4,000 Ohio jobs); information clerk (90,000 national jobs, 3,000 Ohio jobs); and office helper (48,000 national jobs, 3,000 Ohio jobs).  Tr. 57.  The ALJ asked, and the VE affirmed, that these jobs were a representative sample and not an exhaustive list.  Tr. 57.

Next, Conroy's attorney asked the VE whether there are jobs that a hypothetical individual of Conroy's age, education and work experience could perform if the individual is limited to sedentary work; requires a sit/stand option in which he is capable of sitting for 20 minutes at a time and standing for 10 minutes at a time; cannot climb ladders, ropes, or scaffolds; can occasionally climb stairs or ramps; can occasionally reach in all directions; cannot squat, crouch, crawl, or kneel; and must avoid all workplace hazards as well as temperature extremes. Tr. 58.  The VE testified that there are no jobs in the national economy that this hypothetical individual could perform.  Tr. 58.

Conroy's attorney asked the VE to consider whether the same individual as in the ALJ's hypothetical could perform the jobs the VE previously identified if that individual had a sit/stand option and the individual could sit for a maximum of 20 minutes and stand for a maximum of 10 minutes at a time.  Tr. 58-59.  The VE answered, "Personally, I think the jobs could be

performed that way but the problem with it is that the mere act of standing and sitting at those increments takes a person off task.  So therefore I would eliminate the jobs."  Tr. 59.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his March 18, 2015, decision, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.  Tr. 20.

2.     The claimant has not engaged in substantial gainful activity since May 15, 2011, the alleged onset date.  Tr. 20.

3.     The claimant has the following severe impairments: lumbar and cervical degenerative disc disease, left knee degenerative joint disease, and chronic pain syndrome, sometimes identified as fibromyalgia.  Tr. 20.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 21.

5.     The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he can occasionally reach overhead bilaterally, occasionally kneel and crawl, but cannot use vibrating hand tools.  The claimant must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery.  Tr. 21-22.

6.     The claimant is unable to perform any past relevant work.  Tr. 25.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7.    The claimant was born on January 13, 1973 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 26.

8.    The claimant has at least a high school education and is able to communicate in English.  Tr. 26.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 26.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 26.

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 15, 2011 through the date of this decision.  Tr. 27.

## V. Parties' Arguments

Conroy objects to the ALJ's decision on one ground: that the ALJ's finding that he was capable of light work was not supported by the record.  Doc. 14, p. 7-13.  In support of this argument, he contends that the ALJ insufficiently evaluated or misconstrued several pieces of evidence, particularly Dr. Moyen's Functional Capacity Evaluation, and refutes the ALJ's finding that there were large gaps in his treatment.  Doc. 14, pp. 10-13.  In response, the Commissioner submits that the ALJ's consideration of the evidence was not erroneous and his decision is supported by substantial evidence.  Doc. 17, pp. 5-10.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### VII. The ALJ Did Not Err in Finding that Conroy Could Perform Light Work

Conroy argues that the ALJ described a treatment note from a consultation with rheumatologist Dr. Eider in February 2014 as showing a negative rheumatoid factor, normal CDC/LFT, and negative x-rays, but "fails to recognize that this evaluation also demonstrated reduced range of motion and crepitus in both knees, multiple tender points, and a diagnosis of advanced degenerative arthritis of the cervical spine ... and a 'fairly classi[c] case' of fibromyalgia." Doc. 14, p. 9 (citing Tr. 243).  First, Dr. Eider did not find Conroy to have a reduced range of motion in his knees; instead, she found him to have a "full range of motion without significant bony deformity" and mild crepitus in both knees, left greater than right, with range of motion.  Tr. 242.  As for Conroy's "multiple tender points," the ALJ, at step two, found that Conroy's "chronic pain syndrome, sometimes identified as fibromyalgia" was a severe impairment and elsewhere in his decision discussed Conroy's complaints of severe pain all over his body (Tr. 23, 24), his fibromyalgia diagnosis in May 2014 (Tr. 23), and Dr. Leinenbach's finding that Conroy tested positive on 14 out of 18 tender points (Tr. 25).  And the ALJ referenced Conroy's x-ray of his cervical spine, taken in January 2013 (Tr. 23), which was the basis for Dr. Eider's cervical spine assessment (Tr. 243) and again referenced Conroy's cervical spine diagnosis when discussing the notes from another rheumatologist, Dr. Greifenstein, which

16

was also based on Conroy's January 2013 x-rays (Tr. 438).  Tr. 24.  The ALJ's failure to cite to cumulative information in Dr. Eider's treatment notes is not error; the ALJ is not required to discuss each individual treatment note in detail.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (citation omitted).

Next, Conroy asserts, "when discussing a follow up visit in May 2014, the ALJ states that the plaintiff inferred that he was not taking medications for his widespread pain because he believed that they were dangerous" but that "review of this record indicates that Plaintiff was on an upward titration of gabapentin[.]"  Doc. 14, p. 9.  The May 15, 2014, treatment note does state that Conroy "is on the upward titration of gabapentin"; however, as the ALJ accurately observed, the treatment note also stated that Conroy appeared for a routine visit, still had medication from his last visit six months ago, stated at that time that he rarely took his medications because they made him feel tired, and stated that he was unwilling to take medication because he believed it was dangerous.  Tr. 23 (citing Tr. 267 (Gross's treatment note describing Conroy's reports that, although his muscle relaxer is helpful, he does not like to take it because it makes him sleepy and commenting that he still has his muscle relaxant and pain medication from six months earlier); Tr. 268 (Gross explaining that she asked Conroy "why he would not take medications when he is hurting so badly"; that Conroy initially would not answer; and that, finally, Conroy explained that he had memories of his grandfather dying of liver failure, which Conroy attributed to "too many pills.")).  The ALJ's failure to note that Conroy was on an upward titration of gabapentin is not error.  *See Kornecky*, 167 F. App'x at 508.

Conroy also finds fault with the ALJ's discussion of Conroy's visit with rheumatologist Dr. Greifenstein.  Doc. 14, p. 9.  He argues that the ALJ "failed to acknowledge compelling findings on examination" by Dr. Greifenstein, "including diffuse muscle tenderness in the lumbar, thoracic and cervical spine, decreased cervical flexion, decreased range of motion in the left knee with moderate medial discomfort and significant patellar crepitance and positive McMurray's sign."  Doc. 14, p. 9.  While the ALJ did not acknowledge these findings in his decision, he also did not acknowledge that, at this visit, Dr. Greifenstein found him to have 5/5 muscle strength in his arms and legs,  no tenderness in midline over his cervical, thoracic or lumbar spine, no tenderness in his SI joints, and relatively well-preserved cervical extension and lateral rotation.  Tr. 435.  In other words, the ALJ did not "cherry-pick" only favorable portions of Dr. Greifenstein's treatment notes.  The ALJ referenced Dr. Greifenstein's diagnoses and the fact that she ordered an MRI of Conroy's knee, which later showed that he had a tear in his medial meniscus and subtle degenerative changes and mild chondromalacia.  Tr. 24.  That the ALJ did not repeat every diagnosis and notation by Dr. Greifenstein is not reversible error, especially when, as here, the ALJ cited other evidence in the record documenting Conroy's knee and spine issues.  *See* Tr. 20 ("The claimant has … left knee degenerative joint disease"); Tr. 23 (discussing Conroy's claims that his knees give out);  Tr. 24 (discussing Conroy's left knee meniscus tear);  Tr. 24 (discussing Conroy's work restrictions due to the results of the MRI of his left knee); Tr. 24 ("the claimant has some limitations due to his neck, back, and knee pain"); Tr. 20 ("the claimant has … lumbar and cervical degenerative disc disease"); Tr. 23 (discussing Conroy's March 2013 physical therapy evaluation for his lower back pain; commenting that Conroy's 2013 cervical spine x-ray showed mild to moderate degenerative changes and disc

space narrowing; and remarking that Dr. Moyen observed Conroy to have mild restriction of range of motion in his cervical spine).

Conroy also criticizes the ALJ's decision regarding Conroy's daily activities and his "large gaps in treatment."  Doc. 14, p. 9-10.  The ALJ observed,

> From the above, the claimant has some limitations due to his neck, back, and knee pain, as well as his fibromyalgia.  However, he is able to accomplish a wide range of activities on a daily basis, has attended school, goes fishing, and has driven across the country. Further, he has had large gaps in his treatment, and has at times failed to seek readily available medical care.  Thus, he is capable of performing work at the light exertional level, with the limitations outlined above.

> As noted above, the claimant reported that he has gone to "countless hospitals[,]" yet this is not supported by the evidence.  In fact, he has had large gaps in treatment despite the ready availability of health care, indicating that his symptoms are not as severe as alleged.  Moreover, although he claims that he is totally disabled, the claimant told a State consultative examiner that he is independent in his activities of daily living, does household chores, and enjoys going fishing (2F/2).  At the hearing, the claimant testified that he drove his vehicle the entire way when he moved back from Washington (Hearing).  Again, this level of activity suggests that the claimant's symptoms are not as severe as alleged.

Tr. 24.  Conroy argues that this explanation is faulty because, at the Hearing, he testified that it took him "almost a week and a half" to drive back from Washington and that he had to stop "frequently" to "get out and walk around for a little."  Tr. 39, 41, 50.  Nevertheless, he does not dispute that he did, in fact, drive across the country.  He also does not dispute that he fished "roughly three or four times this past summer and fall," stated that he is independent in his activities of daily living, does household chores (including cooking, laundry, cleaning, and going to the grocery store (Tr. 44-45)), and has attended school.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.3d 228, 231 (6th Cir. 1990) ("As a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain."); *see also* SSR 96-7p, 1996 WL 374186, at *3 (an ALJ may consider statements about a claimant's daily activities when assessing credibility).

Conroy asserts that the ALJ did not recognize that he had to take online classes because he could not tolerate the walking and sitting and that he could not even keep up with online classes due to his inability to concentrate because of pain.  Doc. 14, p. 10.  The ALJ, however, explained that he found Conroy's statements concerning the intensity, persistence and limiting effects of his symptoms not entirely credible.  Tr. 22.   He pointed out the gaps in Conroy's treatment, which he was entitled to do.  *See* 20 C.F.R. § 404.1529(c)(3)(iv),(v) ("Factors relevant to your symptoms, such as pain, which we will consider include" medications you have taken and treatment, other than medication, you have received).  Despite the fact that Conroy listed May 15, 2011, as his disability onset date (Tr. 157), the ALJ commented that the earliest medical record is from September 28, 2012, i.e., sixteen months after his alleged onset date.   Tr. 21.  There are also no records dated between March and November 2013 (8 months) and May and November 2014 (6 months), as the ALJ observed (Tr. 23-24).  In addition, the ALJ considered Conroy's non-compliance with treatment recommendations.  Tr. 23 (noting Conroy failed to attend further physical therapy appointments and that he was unwilling to take medication due to side effects of sleepiness and because he believed taking medication was dangerous).  *See* 20 C.F.R. § 404.1529(c)(3)(v).  "In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."  *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004).  The ALJ's assessment of and reliance upon Conroy's lack of medical care and treatment compliance was accurate and proper.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.").

Finally, Conroy argues that the ALJ "wholly ignores compelling portions of the evidence" because he did not mention the Functional Capacity Evaluation Conroy underwent in December 2014.  Doc. 14, pp. 10-11.  The Court disagrees.  The treatment note Conroy refers to was a physical evaluation conducted by Dr. Moyen.  Tr. 273-274.  The ALJ mentioned Dr. Moyen's evaluation (Tr. 24) and, later in his decision, explained that he gave Dr. Moyen's opinion that Conroy "demonstrated guarded movement patterns as a result of generalized pain patterns" little weight because "it is vague and does not outline any specific limitations" and is contradicted by Conroy's stated ability to complete his daily activities (Tr. 25).  To the extent Conroy characterizes Dr. Moyen's evaluation as an opinion that he could only sit for 20 minutes and stand for 10 minutes at a time, such a characterization is misplaced because Dr. Moyen did not opine that Conroy was so limited.  Rather, Dr. Moyen reported what Conroy actually did during his office visit.  *See* Tr. 274 ("Client was able to remain seated for a period of 20 minutes during the subjective portion with moderate corrective positioning.").  Dr. Moyen did advise that, when climbing stairs, Conroy demonstrated a loss of balance and needed to use the handrail and that he was unable to safely perform crawling and kneeling.  Tr. 274.  The ALJ accounted for Conroy's crawling and kneeling limitations, however, when the ALJ restricted Conroy to occasional crawling and kneeling in his RFC assessment.  Tr. 22, 24 (the ALJ explaining that he gave the state agency reviewer's opinion that, in part, Conroy could frequently kneel and crawl "some" weight but restricted Conroy further based on additional evidence, including the meniscus tear in his left knee).

Regardless, any error on the part of the ALJ with respect to Conroy's ability to climb stairs, crawl and kneel is harmless because the jobs identified by the VE do not require climbing, crawling or kneeling.  *See* DICOT 237.367-018 Information Clerk, 1991 WL672187; DICOT

21

239.567-010 Office Helper, 1991 WL672232; DICOT 369.687-018 Folder, 1991 WL673072;

*see also Salter v. Comm'r of Soc. Sec.*, 2015 WL 1880393, at *9 (N.D.Ohio Apr. 24, 2015)

(failure of the ALJ to address and include environmental restrictions in an RFC was harmless

when the jobs did not require exposure to such hazards); *Patterson v. Comm'r of Soc. Sec.*, 2015

WL 5560195, at *8 (N.D.Ohio June 23, 2015) (the ALJ's failure to include postural limitations

such as climbing, crawling and kneeling in an RFC was harmless when the jobs identified by the

VE did not require these activities, rejected in part on other grounds, 2015 WL 5560121

(N.D.Ohio Sept. 21, 2015)); *Hodge v. Astrue*, 2012 WL 589984, at **21-23 (S.D. W. Va. Feb.

22, 2012) (limitations in a claimant's ability to climb were "irrelevant" when climbing was not

required by the jobs identified by the VE).

       In sum, the ALJ's finding that Conroy can perform light work was not erroneous and his

decision must be affirmed.  *See Jones*, 336 F.3d at 477 (the Commissioner's decision must be

affirmed if substantial evidence supports the ALJ's conclusion).

## VII. Conclusion

       For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: July 25, 2016

_____
Kathleen B. Burke
United States Magistrate Judge

22